**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DAVID H. GRIM,**

        **Plaintiff,**

**v.**                                          **Case No. 3:12-cv-09131**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

        **Defendant.**

**MEMORANDUM OPINION**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") terminating Plaintiff's disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 10, 17). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 2, 3). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.    Procedural History

Plaintiff, David H. Grim (the "Claimant"), was found disabled and awarded DIB in 1982, and was subsequently subject to periodic continuing disability reviews. (Tr. at 11, 73). On June 18, 2004, a continuing disability examiner determined that Claimant

remained disabled because he "continue[d] to have frequent seizures" that were "poorly controlled despite medication." (Tr. at 45). On August 4, 2010, a continuing disability examiner determined that Claimant's disability had ceased as of August 1, 2010, and therefore his period of disability would terminate on October 31, 2010. (Tr. at 49). Claimant's termination was affirmed on reconsideration on February 7, 2011, (Tr. at 50, 82), following a hearing before a hearing officer on January 18, 2011. (Tr. at 70-75, 492-502). Claimant filed a request for an administrative hearing, (Tr. at 69), which was held on November 8, 2011 before the Honorable Andrew J. Chwalibog, Administrative Law Judge (the "ALJ"). (Tr. at 28-42). By written decision dated April 5, 2012, the ALJ determined that Claimant's disability ended as of August 1, 2010. (Tr. at 11-21). The ALJ's decision became the final decision of the Commissioner on October 19, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On December 17, 2012, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the proceedings on March 19, 2013. (ECF Nos. 6, 7). Thereafter, both parties filed briefs in support of judgment on the pleadings. (ECF Nos. 10, 17). Accordingly, this matter is ripe for resolution.

## II.    **Claimant's Background**

Claimant was 49 years old on the date his disability was determined to have ceased, and 51 on the date of the ALJ's decision. (Tr. at 20, 157). He graduated from high school and communicates in English. (Tr. at 32). Claimant has not engaged in any significant gainful activity in over 30 years. (Tr. at 499).

III. **Summary of ALJ's Findings**

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under federal law, recipients of disability benefits are subject to periodic continuing disability reviews. 42 U.S.C. § 421(i). Thus, a DIB recipient's benefits may be terminated if substantial evidence demonstrates that "the physical or mental impairment on the basis of which benefits are provided has ceased, does not exist, or is not disabling." 42 U.S.C. § 423(f)(1)-(4).

There is no presumption of continuing disability. 42 U.S.C. § 423(d) ("Any determination made ... shall be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."); *see also Rhoten v. Bowen*, 854 F.2d 667, 669 (4th Cir. 1988). Instead, the Social Security Regulations establish an eight-step sequential evaluation process for reviewing DIB awards during a continuing disability review. *See* 20 C.F.R. § 404.1594(f). If an individual is found "unable to engage in substantial gainful activity" at any step of the process, further review will cease, and the claimant's benefits will be continued. *Id.* First, the ALJ determines whether the claimant is currently engaged in substantial gainful employment. *Id.* § 404.1594(f)(1). Second, if the claimant is not gainfully employed, the ALJ determines whether the claimant has an impairment or combination of impairments that meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative

Regulations No. 4 (the "Listing"). *Id.* § 404.1594(f)(2). If the impairment or combination of impairments does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

Third, if the impairment does not meet or equal a listed impairment, the ALJ must determine whether there has been medical improvement. *Id.* § 404.1594(f)(3). Medical improvement is defined as "any decrease in the medical severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant] was disabled or continued to be disabled." *Id.* § 404.1594(b)(1). To determine whether medical improvement has occurred, the ALJ must "compare the current medical severity of that impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled to the medical severity of that impairment(s) at that time." 20 C.F.R. § 404.1594(b)(7). Any decrease in medical severity "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with" a claimant's impairments. *Id.* § 404.1594(b)(1). Thus, "[i]f there has been no decrease in medical severity, there has been no medical improvement. *Id.* § 404.1594(f)(3). Fourth, if there has been medical improvement, then the ALJ ascertains whether the medical improvement is related to the claimant's ability to do work; that is whether there has been an increase in the claimant's RFC based upon impairments that were present at the time of his or her most recent favorable medical determination. *Id.* § 404.1594(f)(4). If no medical improvement is found at step three, or if medical improvement is found to be unrelated to the claimant's ability to work at step four, then at step five the ALJ will consider whether an exception demonstrating the claimant's ability to engage in substantial gainful activity applies. *Id.* §

404.1594(f)(5).[1]

If the claimant's medical improvement is related to his or her ability to do work under step four, then in the sixth step the ALJ will determine whether all of the claimant's current impairments in combination are considered to be severe. *Id.* § 404.1594(f)(6). If the claimant's impairments in combination do not significantly limit his or her physical or mental abilities to do basic work activities, then the impairments are not considered severe, and the claimant is no longer considered disabled. *Id.* However, if the claimant's impairments in combination are severe, then under the seventh inquiry, the ALJ will assess the claimant's RFC to determine whether the claimant can still do work he or she has done in the past. *Id.* § 404.1594(f)(7). If the claimant cannot do past relevant work, or if there is not sufficient evidence in the file to make this determination, then under step eight the ALJ will consider whether the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1594(f)(8)-(9). In this final step, "the Commissioner bears the burden of demonstrating that work the claimant can perform exists in significant numbers in the national economy." *Guiton v. Colvin*, No. 12–2100, 2013

---

[1] There are two groups of applicable exceptions. The first group of exceptions includes circumstances under which (1) the claimant is "the beneficiary of advances in medical or vocational therapy or technology" related to his or her ability to work; (2) the claimant has undergone vocational therapy related to his or her ability to work; (3) new or improved diagnostic or evaluative techniques demonstrate that the claimant's impairments are not as disabling as they were considered to be at the time of the most recent favorable decision; (4) the prior favorable disability decision was in error; or (5) the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1594(d). The second group of exceptions includes circumstances under which (1) a prior determination or decision was fraudulently obtained; (2) the claimant does not cooperate with the social security evaluators; (3) the claimant cannot be found; or (4) the claimant fails to follow prescribed treatment which would be expected to restore his or her ability to engage in substantial gainful employment. 20 C.F.R. § 404.1594(e). If none of the exceptions apply, the claimant's disability will continue; if one of the first group of exception applies, the claimant will be evaluated under the sixth step; if one of the second group of exceptions applies, the claimant's disability will be found to have ended. 20 C.F.R. § 404.4594(e)(5).

WL 5943517, at *4 (4th Cir. Nov. 7, 2013).

In this case, the ALJ determined as a preliminary matter that Claimant's comparison point decision ("CPD"), the most recent favorable medical decision finding him to be disabled, occurred on June 22, 2004. (Tr. at 12, Finding No. 1). At the time of Claimant's CPD, his medically determinable impairments consisted of "seizures and cognitive disorder," which were found to meet a Listing. (Tr. 13, Finding No. 2).

The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity through August 1, 2010, the date Claimant's disability was deetermined to have ended. (*Id.*, Finding No. 3). The ALJ found that as of August 1, 2010, Claimant suffered from the following medically determinable impairments: "osteoarthritis of the right knee status post total knee arthroplasty; mild degenerative disc disease of the lumbar spine; obesity; headaches; pseudo tumor cerebri; depressive disorder; personality disorder; and conversion disorder." (Tr. at 13-14, Finding No. 4). However, under the second inquiry, the ALJ concluded that as of August 1, 2010, Claimant's impairments, either individually or in combination did not meet or medically equal any of the listed impairments. (Tr. at 14-16, Finding No. 5). Thus, under the third inquiry, the ALJ found that medical improvement had occurred. (Tr. at 16, Finding No. 6).

The ALJ determined that as of August 1, 2010, Claimant's impairments at the time of the CPD had decreased in severity such that he had the RFC to:

> [P]erform a range of light work. He has the ability to lift and carry 10 pounds frequently and 20 pounds occasionally. He can stand, walk, and sit at least six hours in an eight-hour workday. The claimant is limited to simple routine tasks with no production quotas.

(Tr. at 16-17, Finding No. 7). Consequently, the ALJ determined in the fourth step that Claimant's medical improvement was related to his ability to work, because it resulted

in an increase in his RFC. (Tr. at 17, Finding No. 8). In light of this finding, the fifth

inquiry was not applicable. *See* 20 C.F.R. § 404.1594(f)(5).

Under the sixth inquiry, the ALJ found that Claimant continued to have a severe

impairment or combination of impairments. (Tr. at 17, Finding No. 9). Under the

seventh inquiry, the ALJ determined that based upon all of Claimant's impairments as

of August 1, 2010, he had the RFC to:

> [P]erform less than a full range of light work as defined in 20 C.F.R. §
> 404.1567(b). He is able to stand or walk about six hours of an eight-hour
> day and sit for six hours of an eight-hour day. He can never climb a
> ladder or scaffold, but can occasionally climb a ramp or stair, balance,
> stoop, kneel, crouch, and crawl. He needs to avoid concentrated exposure
> to temperature extremes, vibrations, and hazards. He is limited to simple
> routine tasks with no production quotas.

(Tr. at 17-20, Finding No. 10). Claimant had no past relevant work. (Tr. at 20, Finding

No. 11). Thus, under the eighth and final inquiry, the ALJ reviewed Claimant's past

work experience, age, and education in combination with his RFC to determine if he

would be able to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 12-

15). The ALJ considered that (1) Claimant was born in 1960 and was an individual

closely approaching advanced age[2]; (2) he had at least a high school education and

could communicate in English; and (3) transferability of job skills was not material

because Claimant does not have past relevant work. (Tr. at 20, Finding Nos. 12-14).

Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ

determined that Claimant could perform jobs that exist in significant numbers in the

national economy. (Tr. at 20-21, Finding No. 15). At the light level, Claimant could

work as a house sitter, nonclerical office helper, or an unarmed night watchman; and

at the sedentary level, Claimant could work as a surveillance system monitor,

---

[2] As of August 1, 2010, Claimant was 2 months shy of 50 years of age. *See* 20 C.F.R. § 404.1563(d)
(characterizing ages 50-54 as constituting "closely approaching advanced age").

grader/sorter, and product inspector. (Tr. at 21). Therefore, the ALJ concluded that Claimant's disability ended as of August 1, 2010. (*Id.*, Finding No. 16).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is no longer supported by substantial evidence, in light of new evidence submitted to the Appeals Counsel subsequent to the ALJ's decision. (ECF No. 10 at 6-9). Specifically, Claimant argues that new medical records documenting a subsequent left knee injury, as well as updated reports from Claimant's treating physicians, Dr. McComas and Dr. Cremeans, demonstrate that the ALJ's determination as to Claimant's continuing disability is both "clearly wrong and not supported by substantial evidence." (*Id.* at 7-9).

## V.   **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A.  **Treatment Records from Comparison Point Decision (2003-04)**

On May 13, 2003, Claimant was seen by his treating neurologist, Carl F. McComas, M.D., for seizures. (Tr. at 252). Claimant reported that he had "been having more seizures in recent weeks," and in fact he had a seizure in the examining room, after which his "left side became numb." (Tr. at 252). Dr. McComas noted that Claimant's "seizures have increased in frequency" and switched his medication from Tegretol to Keppra, with instructions to follow-up later in the summer. (Tr. at 252).

On March 18, 2004, Claimant had a follow up visit with Dr. McComas. (Tr. at 253). At that point, Claimant reported that he "still has frequent seizures, though they are not as intense as they were previously." (Tr. at 253). Dr. McComas noted that

Claimant's "seizures are still poorly controlled" and increased his Keppra dosage with instructions to follow-up in the summer. (Tr. at 253).

### B. Treatment Records Submitted to the ALJ (2009-11)

#### 1. Physical Treatment

On March 11, 2009, Claimant was seen by Gary D. Cremeans II, M.D. for surgical clearance in anticipation of an upcoming arthroscopic surgery of the right knee. (Tr. at 293). Claimant reportedly had no complaints, although he did note that his blood pressure was slightly elevated due to walking on his sore knee and related back pain. (*Id.*). Claimant's physical examination was essentially normal, except that he had "pain with range of motion" in his right knee and back. (Tr. at 293). Dr. Cremeans assessed Claimant with right knee pain, noting that he had low risk for surgery, as his EKG and lab results were within normal limits. (*Id.*). Dr. Cremeans also assessed Claimant with hyperlipidemia, anxiety and chronic pain, gastroesophageal reflux disease ("GERD"), and hypertension, for which Claimant was instructed to continue his prescribed medication. (Tr. at 293).

On May 1, 2009, Claimant was seen by Dr. McComas, who described Claimant as having "a remote history of encephalitis related pseudotumor cerebri, remote seizures and chronic back pain." (Tr. at 270). Claimant reported that he was "about the same," although he did note that he was in physical therapy to rehabilitate his right knee, post-surgery. (Tr. at 270). Claimant's physical examination was largely unremarkable, and Dr. McComas assessed Claimant as "about the same," with instructions to follow-up in six months. (Tr. at 270).

On September 16, 2009, Claimant was seen by Dr. Cremeans for a check-up. (Tr. at 292). Claimant believed that "his intracranial pressure [was] up again, but it

ha[d] been that way for several years and his neurologist [was] well aware of this." (Tr. at 292). Claimant's physical examination was entirely within normal limits, although Dr. Cremeans did note that Claimant was wearing a right knee brace. (Tr. at 292). Dr. Cremeans assessed Claimant with hyperlipidemia, hypertension, insomnia, and GERD, for which Claimant was instructed to continue his prescribed medication. (Tr. at 292).

On November 16, 2009, Claimant received MRI scans of his lumbar spine and brain. Claimant's lumbar spine MRI revealed "loss of T2 weighted signal in the L2-3 through L5-S1 intervertebral discs in keeping with degenerative disc change." (Tr. at 267). The MRI also revealed a "disc bulge at L3-4 with facet degenerative change causing moderate left sided inferior foraminal narrowing" although "this finding [was] unchanged from 12/08." (Tr. at 267). There was also a small "annular tear seen in L5-S1" which was new from the prior study. (Tr. at 267). Claimant's brain MRI was negative, as there were "no areas of abnormal signal mas, mass effect or other finding[s]." (Tr. at 301).

On January 11, 2010, Claimant was seen by Dr. Cremeans. (Tr. at 291). Claimant's physical examination was within normal limits, but he reported that he was terminated from the Cabell Huntington Hospital Pain Clinic after his urinalysis results were positive for heroin, although he denied any prior heroin use. (Tr. at 291). A subsequent hair follicle screen test was "negative for any type of heroin metabolite," but Claimant elected not to return to the pain clinic and was instead referred to Dr. Caraway for pain management. (Tr. at 290).

On February 9, 2010, Claimant had a follow up visit with Dr. McComas, who noted Claimant's "remote history of encephalitis-related pseudotumor cerebri, remote seizures, and chronic back pain." (Tr. at 265). Claimant reported that he was about the

same, and stated that he was scheduled for right knee total replacement the following month. (Tr. at 265). Claimant's physical exam was unremarkable and Dr. McComas assessed Claimant as "about the same," with instructions to follow-up in six months. (Tr. at 265).

In March 2010, Claimant attended several preoperative appointments in anticipation of his right knee surgery. (Tr. at 289, 362, 364-67, 380-81). On March 8, 2010, William Wallace, M.D. conducted a cardiovascular exam and preoperative exam of Claimant. (Tr. at 362). Claimant's physical exam was unremarkable, while his chest x-ray results were negative with respect to his heart and lungs. (Tr. at 364-66). On March 17, 2010, Claimant reported to Dr. Cremeans that his blood pressure had been "spiking up a little bit" following a preoperative decrease in his pain medication, but he denied any other problems. (Tr. at 289). Claimant's medical exam was normal. (Tr. at 289). Dr. Cremeans assessed Claimant with fluctuating blood pressures and right knee pain, but predicted that Claimant's blood pressure would improve following surgery, once his pain was under control. (Tr. at 289). On March 26, 2010, Claimant met with orthopedic surgeon Ali Oliashirazi, M.D. in anticipation of his knee surgery. (Tr. at 381). Claimant's physical exam was essentially normal, (Tr. at 381), and x-ray results of his right knee revealed "severe arthritis of the medial compartment with varus deformity secondary to AVN of the medial femoral condyle," as well as "moderate patellofemoral arthritis." (Tr. at 380). Dr. Oliashirazi and Claimant reviewed the plan for Claimant's knee replacement. (Tr. at 381).

On March 29, 2010, Dr. Oliashirazi operated on Claimant's right knee, (Tr. at 385-86), after which x-ray results revealed "appropriate appearance of the right knee following total knee replacement." (Tr. at 384). Claimant tolerated the operation "well

without complications," (Tr. at 396), and was treated by Ahmet Ozturk, M.D. for postoperative pain management. (Tr. at 389-93). On April 1, 2010, Claimant was diagnosed with "severe degenerative joint disease right knee status post right total knee arthroplasty" and was discharged from the hospital in stable condition with instructions to follow up with Dr. Oliashirazi two weeks later. (Tr. at 395-97).

On April 15, 2010, Claimant was treated by Dr. Ozturk for pain management. (Tr. at 298-300). Claimant presented as well-developed, well-nourished, alert, oriented and cooperative. (Tr. at 299). Dr. Ozturk prescribed Claimant with MS Contin and Lortab, and placed him on a four-week medication tapering schedule for his pain medication. (*Id.*). On April 22, 2010, Claimant attended a follow-up appointment with Dr. Oliashirazi. (Tr. at 387). Claimant denied any "numbness, tingling, fever, chills, or weight loss" and his physical exam was within normal limits. (Tr. at 387).

On May 12, 2010, Claimant was referred to Philip Fisher, D.O. for pain management. (Tr. at 461-63). Claimant reported that his "low back pain comes and goes," and increases with "sitting and standing for prolonged periods of time." (Tr. at 461). Claimant denied leg or feet numbness. (Tr. at 461). In his review of systems, Claimant reported mental status changes, numbness, headaches, sleep problems, fatigue, urinating frequently at night, heartburn, leg pain with walking, and visual disturbance or change. (Tr. at 462). Claimant also reported a history of depression, back pain, seizure disorders, kidney stones, and hypertension, although Dr. Fisher noted that "[d]ue to the traumatic brain injury, [Claimant] is a poor historian." (Tr. at 462). Dr. Fisher's diagnostic impression included facet arthropathy, DJD lumbar, DDD lumbar/lumbosacral, lumbosacral pain, lumbar/lumbosacral radiculopathy, compression fracture, and traumatic brain injury, and he instructed Claimant to follow

up in three months. (Tr. at 462).

On June 17, 2010, Claimant was seen by Dr. Cremeans for a check-up. (Tr. at 346). Claimant reported that he was "doing quite well and really has no complaints today." (Tr. at 346). Claimant also expressed satisfaction with Dr. Fisher. (*Id.*). Claimant's physical exam was essentially normal, except for a small lesion on his left cheek, for which Dr. Cremeans referred him to a dermatologist. (Tr. at 346). Claimant was instructed to continue his prescribed medication for hyperlipidemia, insomnia, GERD, and hypertension. (Tr. at 346).

On August 13, 2010, Claimant attended a follow-up appointment with Dr. Fisher. (Tr. at 464). Claimant complained of "some lumbosacral pain with increased pain in his left knee," and reported that he had "been favoring his post-op right knee and overusing the left." (Tr. at 464). A recent 21-pound weight gain also seemed to aggravate his left knee pain. (Tr. at 464). Dr. Fisher gave Claimant a corticosteroid injection into his left knee and counseled Claimant on weight loss efforts, with instructions to follow-up in 4 months. (Tr. at 464).

On August 23, 2010, Claimant attended a follow-up visit with Dr. McComas, during which he reported that "he has had no pain in the right knee at all now." (Tr. at 471). Claimant's blood pressure was 160/104, but otherwise his physical examination was unremarkable. (Tr. at 471). Dr. McComas assessed him as "stable" and continued his Zanaflex prescription with instructions to follow up in six months. (Tr. at 471). Dr. McComas also completed a Physician's Statement of Continuous Total Disability, in which he diagnosed Claimant with "chronic back pain" and "shunted pseudotumor cerebri." (Tr. at 472). Dr. McComas described Claimant's progress as "unimproved" and opined that Claimant was disabled from any occupation, and that he would never

be able to resume any work. (Tr. at 472). On February 28, 2011, Claimant attended a follow-up visit with Dr. McComas, in which Claimant reported that he was "about the same" but that he "feels somewhat dopey throughout the day." (Tr. at 514). Dr. McComas described Claimant as "stable" and continued his Zanaflex prescription, with instructions to follow-up in four months. (Tr. at 514).

On September 12, 2011, Claimant was seen by Charles M. Rhodes, M.D. with complaints of chronic back pain and intercranial pressure. (Tr. at 520-22). Dr. Rhodes assessed Claimant with HTN uncontrolled, LDD/Chronic Pain, and dyslipidemia, and referred him to Dr. Bell. (Tr. at 520). On October 27, 2011, Claimant complained primarily of back pain, and was assessed with HTN, LDD/Chronic, and Dyslipidemia. (Tr. at 517).

### 2. *Mental Health Treatment*

Between February 2009 and January 2010, Claimant received mental health treatment from Tara F. Ray, D.O. on five occasions. (Tr. at 258-64). On February 10, 2009, Claimant reported feeling "not good," having "some increased anxiety symptoms" and anhedonia, and that "sleep [was] problematic unless Restoril used." (Tr. at 264). Claimant also complained of increased knee pain "which makes the back worse." (Tr. at 264). Claimant's mental status exam reflected that Claimant's insight was limited, but otherwise his appearance, affect, judgment, thought process, sensorium, and gait were largely within normal limits, and no physical distress, episodes, suicidal/homicidal ideations, or psychosis were observed. (Tr. at 264). Dr. Ray observed that Claimant was "still with notable Axis II pathology," but that he had experienced "catharsis regarding recent anti-social stressors/events" and that Claimant was "agreeable to medication changes to attempt increased treatment

efficacy." (Tr. at 264). Dr. Ray diagnosed Claimant with "MDD, rec, mod," pain D/O, personality D/O, and history of conversion D/O, and increased his medication dosages. (Tr. at 264).

In May, July, and October of 2009, Claimant continued to experience anhedonia emotional upset relating to his knee pain, as well as notable Axis II pathology, although his sleep seemed to improve. (Tr. at 260-62). Claimant's mental status exams were all essentially unchanged from his February 2009 exam, and Dr. Ray's diagnosis remained the same, as Claimant continued to experience "ongoing symptoms in [the] context of physical ailments." (*Id.*). During this time, Claimant declined to adjust his medication, as he felt that an increase in physical health would improve his mental symptoms as well. (*Id.*).

On January 27, 2010, Claimant reported "no current depression symptoms beyond his baseline," and that "chronic pain continue[d] to lend to his depressive symptoms." (Tr. at 258). Claimant's mental status exam remained unchanged, and Claimant's was reportedly "pleased with treatment as is and wants to keep treatment the same as such." (Tr. at 258). Dr. Ray's diagnosis remained the same, although she noted that Claimant was "stable with treatment in place," and Claimant was instructed to follow up in four months. (Tr. at 258).

## C. Consultative Examinations and RFC Opinions

### 1. *Physical Evaluations*

On June 22, 2010, Kip Beard, M.D. conducted an internal medicine examination of Claimant, which included an interview, a review of his medical history and medical records, and a full physical examination. (Tr. at 347-52). Claimant reported a history of ongoing back problems and headaches dating back to his fall

occurring in 1979, as well as pain in both knees. (Tr. at 347-48). Claimant reported "mid to low back pain that is constantly present," which he graded at about 4-5 on a scale of 10, and described as sharp and radiating to his head. (Tr. at 347-48). He reported difficulty with prolonged standing, sitting, walking, and repetitive activities such as bending, and stated that medication was "somewhat helpful at least temporarily." (Tr. at 348). Claimant reported "some improvement in terms of the intensity of the [right] knee pain" following his knee replacement on March 29, 2010, but he stated that he was "noticing his left knee hurting him more so now." (Tr. at 348). Claimant reported intermittent right knee pain, graded at 4 on a scale of 10, which he described as "arthritic" and worse with weight-bearing. (Tr. at 348). Regarding his headaches, Claimant reported "posterior left-sided discomfort, described as a numbness that affects his thinking" and stated that they occur "at least three to four [times] per month, lasting anywhere from two hours to two days" with discomfort rated at 7 on a scale of 10. (Tr. at 348).

Claimant's physical exam reflected that his gait was "mildly limping on the right but not unsteady, not unpredictable." (Tr. at 349). Dr. Beard observed that Claimant could stand unassisted, had a "mild degree of difficulty arising from a seat, and stepping up and down from the examination table," but "seemed comfortable while seated and uncomfortable mildly supine with some back discomfort." (Tr. at 349). Dr. Beard's examination of Claimant's vital signs, HEENT, neck, chest, cardiovascular system, abdomen, and extremities, was essentially unremarkable. (Tr. at 349-50). Claimant's cervical spine, arms, hands, and ankles/feet were also within normal limits. (Tr. at 350-51). Claimant's right knee revealed a "well-healed anterior scar consistent with total knee arthroplasty," "some post-op generalized swelling, mild to moderate

with palpable mild warmth," but no redness or obvious effusion. (Tr. at 350-51). There was "restriction and pain with tenderness," and Claimant's flexion was to 90°, while his extension was to 15°. (Tr. at 351). An accompanying x-ray report reflects that there was "a complete knee replacement," and that "the prosthesis [was] in good position and alignment." (Tr. at 353). Claimant's left knee revealed "mild pain with tenderness with some crepitus" but "[n]o redness, warmth, swelling, or effusion." Claimant's flexion was to 130° with normal range of motion otherwise. (Tr. at 351). Claimant's dorsolumbar spine revealed a "well-healed scar in the lumbar region," and Claimant complained of "mild-to-moderate pain on forward bending with stiffness," with tenderness present, but no spasm. (Tr. at 351). Claimant's flexion was to 70° with normal range of motion otherwise. (Tr. at 351). Claimant could stand on one leg alone, and there was no leg length discrepancy. (Tr. at 351). Claimant's seated straight leg raise was to 90° with some back discomfort, supine leg raise was to 75° with some back discomfort, and his hips had normal range of motion without pain or tenderness. (Tr. at 351). Claimant's neurologic exam reflected "some mild weakness of the right knee," but no sensory loss or atrophy. (Tr. at 351). Claimant's deep tendon reflexes were graded 1+ of the patellae and achilles, and Claimant was "able to heel-walk, toe-walk, and tandem walk with pain" but was "not able to fully squat." (Tr. at 351).

Dr. Beard then diagnosed Claimant with "pseudotumor cerebri, status post shunting," "chronic headache secondary to pseudotumor cerebri status post shunting," "osteoarthritis status post right knee total arthroplasty," and "chronic lumbosacral strain with MRI evidence of degenerative disk disease and facet degeneration." (Tr. at 351). In his summary, Dr. Beard observed that Claimant's right knee revealed "well-healed scarring" from his total knee arthroplasty, although some post-op swelling and

warmth was present, as well as motion loss with some mild weakness. (Tr. at 351). Claimant's gait was "limping mildly on the right" but Dr. Beard did "not seen an obvious need for ambulatory aids." (Tr. at 351). Claimant's back showed "some range of motion abnormalities," but "negative straight leg raising, symmetric reflexes, and no radiculopathy." (Tr. at 352). Regarding Claimant's pseudotumor cerebri and headaches, Dr. Beard observed "a well-healed scar in the lumbar region representing the shunt" but noted that Claimant's "[n]eurologic exam appears unremarkable." (Tr. at 352).

On July 7, 2010, Fulvio Franyutti, M.D. provided a physical RFC opinion of Claimant based upon Dr. Beard's examination. (Tr. at 354-61). Dr. Franyutti opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 355). Dr. Franyutti opined that Claimant could never climb ladders, ropes, or scaffolds, but that he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 356). Dr. Franyutti assigned no manipulative, visual, or communicative limitations to Claimant. (Tr. at 357-58). As for environmental limitations, Dr. Franyutti opined that Claimant could withstand unlimited wetness, humidity, noise, and irritants such as fumes, odors, dusts, gases, and poor ventilation; but that he should avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards such as machinery and heights. (Tr. at 358). Dr. Franyutti found Claimant's statements to be "partially credible," (Tr. at 359), and concluded that "[t]here is significant medical improvement." (Tr. at 361).

On August 20, 2010, Kumar Swami, M.D. provided a Case Analysis and Medical

Consultant's Review of Dr. Franyutti's Physical RFC opinion. (Tr. at 468-70). Dr. Swami noted Claimant's prior history of seizures dating back to 1980, but observed that recent medical records from 2009 and 2010 did not include any complaints, diagnoses, or treatment for seizures or epilepsy. (Tr. at 468). Dr. Swami concluded that there was "evidence for medical improvement," given that Claimant "had uncontrolled epilepsy at CPD" and his seizures were now "fully controlled." (Tr. at 468). Accordingly, Dr. Swami agreed entirely with Dr. Franyutti's Physical RFC opinion. (Tr. at 469).

On October 18, 2010, A. Rafael Gomez, M.D. provided a Case Analysis, in which he "affirmed as written" Dr. Franyutti's Physical RFC opinion after reviewing all the evidence in file. (Tr. at 474).

### 2. Mental Evaluations

On June 8, 2010, Penny O. Perdue, M.A., conducted a clinical interview and mental status exam of Claimant. (Tr. at 342-45). During the interview, Claimant reported experiencing chronic pain, and explained that "if the pain is severe for several days then he gets depressed," but "[w]hen the pain is not so severe, his mood improves." (Tr. at 342). Claimant reported "experiencing depressive symptoms a few days a month, depending on his pain levels," which include "lack of interest in things, loss of energy, thoughts of death, poor concentration, suicidal ideations without intent, irritability, increased nervousness, and increased worrying." (Tr. at 342). Regarding his conversion disorder diagnosis, Claimant reported that although initially his head injury caused seizures, later he believed that the seizures were triggered by severe back pain. (Tr. at 342). Claimant also reported short-term memory difficulties such as losing his train of thought, being unable to finish a sentence, and difficulty retaining

information he doesn't use regularly. (Tr. at 342).

In his mental status exam, Claimant's "remote memory appeared mildly deficient," as he had "some difficulty relat[ing] specific aspects of his history," and he reported "occasional suicidal ideations without intent." (Tr. at 344). Otherwise, Claimant's appearance, attitude/behavior, social interaction, speech, orientation, mood, affect, thought process, perception, insight, judgment, immediate memory, recent memory, concentration, and psychomotor activity were all within normal limits. (Tr. at 343-44). Accordingly, Ms. Perdue diagnosed Claimant along Axis I with "adjustment disorder with depressed mood" and "conversion disorder" based upon Claimant's reported symptoms and history. (Tr. at 344). Ms. Perdue opined that Claimant's prognosis was "fair for psychological difficulties." (Tr. at 344).

Claimant described activities of daily living consisting of doing light cleaning such as "running the sweeper, doing some laundry, and doing the dishes," although "he has to take breaks while doing these tasks." (Tr. at 344). Claimant reported that he uses electric carts while shopping and that "his driving is very limited due to his medications." (Tr. at 344). Claimant reported that he "performs grooming and hygiene tasks independently and handles his own finances." (Tr. at 344). Claimant's observed pace, persistence, and social functioning were within normal limits, although Claimant reported no social activities and described himself as "keeping to myself or with family only." (Tr. at 345).

On July 21, 2010, Philip E. Comer, Ph.D. provided a psychiatric review technique and mental RFC opinion based upon Ms. Perdue's evaluation. (Tr. at 435-52). Dr. Comer diagnosed Claimant with "Adjustment D/O with Depressed Mood," "Conversion D/O vs Pain D/O," and Personality D/O NOS. (Tr. at 442, 445-46). Dr.

Comer concluded that Claimant did not meet any of the mental impairment Listings as he was only mildly limited in his activities of daily living and ability to maintain social functioning; moderately limited in his ability to maintain concentration, persistence, and pace; and had suffered from one or two episodes of extended decompensation. (Tr. at 449-50).

Regarding Claimant's mental RFC, Dr. Comer opined that Claimant was "moderately limited" in his abilities to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. (Tr. at 435-36). Otherwise, Dr. Comer opined that Claimant was "not significantly limited" with respect to all other functional capacities relating to understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (Tr. at 435-36). Dr. Comer further opined that "Claimant's statements are reasonably consistent with CE and treatment records and are credible from his perspective." (Tr. at 437). However, Dr. Comer nevertheless concluded that Claimant "appears to have the mental/emotional capacity for worklike activity in a low pace work environment that can accommodate his physical limitations." (Tr. at 437).

On August 18, 2010, Charles Tucker, Ph.D. provided a Case Analysis in light of Dr. Ray's mental health treatment records. (Tr. at 467). At Claimant's CPD, "[t]here were no allegations or evidence of a mental impairment." (Tr. at 467). Dr. Tucker noted Dr. Ray's "treatment for MDD, Pers. DO and H/O Conversion Disorder with

psychotropic meds" but observed that a treatment note dated January 27, 2010 "states that [Claimant's] depression is a result of chronic pain and has not gone beyond his baseline," and that Claimant's mental status exam "was essentially within normal limits." (Tr. at 467). Accordingly, in his Medical Consultant's Review of Dr. Comer's PRT and Mental RFC Opinion, Dr. Tucker agreed entirely with Dr. Comer's assessments. (Tr. at 453-55, 465-66).

On October 28, 2010, Timothy Saar, Ph.D. provided a Case Analysis in which he "affirmed as written" Dr. Comer's Psychiatric Review Technique and Mental RFC opinion after reviewing all the medical evidence on record. (Tr. at 475).

### D. New Evidence Submitted to the Appeals Council (2012)

#### 1.  *Treatment Notes Regarding to Claimant's Left Knee*

On April 4, 2012, Dr. Oliashirazi examined Claimant, who reported "no complaints concerning the right knee," but stated that he was "not doing what he wants to because of" left knee pain. (Tr. at 250-51). Claimant's physical examination was within normal limits, except that his "[l]eft knee ha[d] some patellofemoral crepitance and pain and tibiofemoral crepitance and pain." (Tr. at 250). X-ray results of Claimant's right knee showed "all cemented posterior-stabilized total knee arthroplasty on the right side" and "otherwise normal bony alignment and architecture." (Tr. at 249). Dr. Oliashirazi assessed Claimant with "probable severe arthritis of the left knee" and reviewed treatment options "including conservative management, physical therapy, weight loss, bracing, and injection versus operative treatment" (Tr. at 250). Dr. Oliashirazi instructed Claimant to follow-up in three weeks for x-rays of his left knee. (Tr. at 250).

On April 25, 2012, Claimant returned to Dr. Oliashirazi for left knee

examination. (Tr. at 244-48). Claimant's physical exam revealed that his gait was antalgic, his "[l]eft knee had some patellofemoral crepitance and pain" and he had "mild pain with stress of the medial meniscus." (Tr. at 247). Otherwise, his physical examination was within normal limits. (*Id.*). X-ray results of Claimant's left knee revealed "mild arthritis of the medical compartment, varus deformity" as well as "mild patellafemoral arthritis on the left side." (Tr. at 246). Otherwise, there was "normal bony alignment and architecture." (Tr. at 246). Dr. Oliashirazi assessed Claimant with "patellofemoral pain syndrome on the left side, probable medial meniscal tear" and mild arthritis of the left knee. (Tr. at 247). Dr. Oliashirazi recommended physical therapy and referred Claimant to Dr. Jasko for further evaluation and treatment. (Tr. at 247).

On May 4, 2012, Claimant was treated by John J. Jasko, M.D. for left knee pain. (Tr. at 237-40). Claimant reported experiencing left knee discomfort for the past 9 to 10 months, and stated that the cortisone injections he received two months prior had not helped him. (Tr. at 237). Claimant reported "worsening pain on the medial aspect of his left knee, pretty much all day with weightbearing" and denied any type of injury. (Tr. at 239). Claimant reported that his knee hurts when he goes up and down steps, but does not wake him from sleep. (Tr. at 239). Additionally, Claimant reported "a history of epilepsy but no seizures in the past 5 years." (Tr. at 239). Claimant's physical exam reflected that Claimant had a "slightly antalgic gait on the left knee" and that he was "tender to palpation over the medial joint line and [had] worsening pain with McMurray's maneuver." (Tr. at 239). Moreover, "[a]ny flexion past 100 degrees cause[d] him significant discomfort." (*Id.*). Dr. Jasko reviewed Claimant's x-rays, noting that he "has diminished medial joint line base but certainly not bone on bone."

(Tr. at 240). Accordingly, Claimant was assessed with "medial joint arthritis with likely a meniscus tear." (Tr. at 240). Dr. Jasko ordered an MRI and had Claimant fitted for an unloader brace. (Tr. at 240).

On May 13, 2012, Claimant's left knee MRI results revealed "a complex tear involving the posterior horn medial meniscus," which "extends to the peripheral margin of the meniscus adjacent to the tibial collateral ligament." (Tr. at 235). Additionally, "superficial subcutaneous edematous changes [were] seen laterally and anteriorly." (Tr. at 235). Otherwise, Claimant's lateral meniscus was intact, the "cruciate and collateral ligaments [were] within normal limits," his "knee extensor mechanism [was] intact" and "bony structures demonstrate[d] appropriate marrow signal." (Tr. at 235-36). Accordingly, Claimant was diagnosed with a "complex tear involving the mid body and posterior horn medial meniscus" and "superficial edema involving the lateral and anterior soft tissues." (Tr. at 236). At a follow-up appointment on May 16, 2012, Dr. Jasko reviewed the results of Claimant's left knee MRI and noted that he was "tender along the medial joint line, having mechanical symptoms." (Tr. at 234). Dr. Jasko opined that Claimant "has a combination of arthritis and a meniscus tear that is causing him symptoms." (Tr. at 234). They discussed the possibility of a left knee arthroscopy, but Claimant declined at that time due to his mother's illness. (Tr. at 234).

On July 5, 2012, Dr. Jasko performed a "left knee arthroscopy with partial medial meniscectomy" and "left knee arthroscopy with partial synovectomy and excision of medial and lateral plica" on Claimant. (Tr. at 232). Claimant "tolerated the procedure well" and "was taken to the recovery room in stable condition." (Tr. at 233). On July 17, 2012, Claimant attended a follow-up appointment with Dr. Jasko. (Tr. at

231). Dr. Jasko observed that Claimant's "knee looks good" and that he had "full extension, flexion to 120 degrees." (Tr. at 231). Claimant reported "having problems with some low back pain and hip pain with walking," and on exam, he had "some pain posterior" with internal rotation and "tenderness along the greater trochanter and lumbar musculatures" but "no significant weakness lower extremity." (Tr. at 231). Dr. Jasko opined that Claimant had "lower back strain, greater trochanteric bursitis," which he added to Claimant's physical therapy order in addition to working on his left knee. (Tr. at 231).

### 2.  Opinion Letters from Claimant's Treating Physicians

On June 22, 2012, Dr. Cremeans provided a letter addressed "to whom it may concern," in which he relayed that Claimant "has a history of chronic back pain and DJD of his knee" and was seeing Dr. Hollingsworth for pain control. (Tr. at 230). Dr. Cremeans stated that Claimant "currently takes, among other things, tizanidine 4mg, two in the morning, two at noon and three at bedtime; alprazolam 1 mg twice daily; Seroquel 100 mg in the evening; temazepam 30 mg at bedtime; and Kadian approximately twice daily." (Tr. at 230). Dr. Cremeans concluded that "[t]hese medications alone are extremely sedating and, when in combination, can cause a patient to be poorly functional." (Tr. at 230).

On July 20, 2012, Dr. McComas provided a letter addressed "to whom it may concern," in which he stated that Claimant has "a history of encephalitis in the early 1980s following which she *[sic]* developed seizures and pseudotumor cerebri." (Tr. at 229). Dr. McComas stated that "[w]hile [Claimant] no longer has seizures or evidence of pseudotumor cerebri he does have ongoing headaches and episodes of left-sided numbness." (Tr. at 229). Dr. McComas also noted that Claimant has "chronic low back

pain for which he sees a pain specialist and is prescribed a variety of medications including narcotics as well as sedating muscle relaxants." (Tr. at 229). Dr. McComas concluded that "[a]s such [Claimant] remains permanently and totally disabled from any occupation." (Tr. at 229).

## VI.    <u>Standard of Review</u>

The Court may remand the Commissioner's decision for a rehearing under sentence four of 42 U.S.C. § 405(g). A sentence four remand is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applies the law when reaching the decision, or the basis of the Commissioner's decision is indiscernible. *Brown v. Astrue,* Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted). If new and material evidence is submitted after the ALJ's decision, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b). Evidence is considered new "if it is not duplicative or cumulative," and considered material "if there is a reasonable possibility that the new evidence would have changed the outcome." *Wilkins v. Secretary, Dept. of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). When the Appeals Council incorporates new and material evidence into the administrative record, and nevertheless denies review of the ALJ's findings and conclusions, the issue before the Court is whether the Commissioner's decision is supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated

into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (internal marks omitted) (remanding for rehearing pursuant to sentence four of 42 U.S.C. § 405(g))); *see also Wilkins v. Secretary*, 953 F.2d 93, 96 (4th Cir. 1991); *Gann v. Astrue*, No. 1:09-cv-355, 2010 WL 3811942, at *14 (W.D.N.C. Sept. 1, 2010) (applying *Wilkins* review to cessation of benefits cases). If the additional evidence renders the ALJ's decision unsupported by substantial evidence on the record, the Court may remand the matter for a rehearing under sentence four.[3] *See Money v. Astrue*, No. 1:08-cv-895, 2011 WL 3841972, at *5-7 (M.D.N.C. Aug. 26, 2011) (remanding cessation of benefits case on ground that new and material evidence submitted to the Appeals Council "raise[d] substantial questions about the validity of the conclusions of the non-examining psychologist" relied upon by the ALJ).

Here, Claimant provided additional evidence while his request for review by the Appeals Council was pending. (Tr. at 228-51). The Appeals Council considered the new evidence and incorporated it into the administrative record, but concluded that it did not provide a basis for changing the ALJ's decision. (Tr. at 1-2, 4-5). Accordingly, the issue is whether the ALJ's decision is supported by substantial evidence, in light of the new evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with

---

[3] Sentence four allows the court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is no longer disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.   <u>Analysis</u>

Under 42 U.S.C. § 423(f)(1), a DIB recipient's benefits may be terminated if substantial evidence demonstrates that (1) "there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work)," and (2) "the individual is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f)(1). When reviewing an administrative determination that a claimant is no longer disabled, the ALJ must examine the impairments that gave rise to the prior finding of disability and confirm that they medically improved as of the date of disability cessation. If so, the ALJ must then consider all of the claimant's impairments as they existed on the date of disability cessation and verify that the claimant is able to work despite the current combination of impairments. Any determination that a claimant is no longer disabled must be "made on the basis of all the evidence available in the individual's

case file, including new evidence concerning the individual's prior or current condition which is presented by the individual or secured by the Commissioner." 42 U.S.C. § 423(f).

Claimant alleges that the Commissioner's decision to terminate his benefits is not supported by substantial evidence in light of the additional medical records and correspondence submitted to the Appeals Council subsequent to the ALJ's decision. (ECF No. 10 at 6-9). Having reviewed the record in its entirety, the Court concludes that the additional records neither contradict the ALJ's finding that there was medical improvement relating to Claimant's ability to work, (Tr. at 16-17), nor call into question the ALJ's physical RFC assessment and corresponding determination that Claimant's disability ended as of August 1, 2010. (Tr. at 20-21). Accordingly, the ALJ's decision is supported by substantial evidence on the record.

First, the additional evidence does not undermine the ALJ's determination that Claimant experienced medical improvement relating to his ability to do work. "Medical improvement" is defined as "any decrease in the medical severity of [a Claimant's] impairment(s) which was present at the time of the most recent favorable medical decision." 20 C.F.R. § 404.1594. At the time of Claimant's CPD, he was found disabled due to regular, uncontrolled seizures and left-sided numbness. (Tr. at 45, 252-53). However, by 2009, Claimant's seizures had apparently ceased, as Dr. McComas repeatedly described Claimant as having a history of "remote seizures," (Tr. at 265, 270), and in May of 2012 Claimant himself reported that he had not experienced any seizures in five years. (Tr. at 239). Moreover, as Dr. Swami noted in his opinion, Claimant's treatment notes are entirely void of any reported complaints, diagnoses, or prescribed medications for seizures or epilepsy. (Tr. at 468). During his June 2010

consultative examination by Dr. Beard, Claimant did report experiencing headaches and left sided-numbness, (Tr. at 348), although treatment records contain only a single complaint of headaches and numbness to Dr. Fisher in May 2010. (Tr. at 462). Based upon Dr. Beard's examination, Dr. Franyutti opined that Claimant had the physical RFC to perform light work, with some postural and environmental limitations, (Tr. at 355-60), while Dr. Comer opined that Claimant had the "mental/emotional capacity for work-like activity in a low pace work environment that can accommodate his physical limitations." (Tr. at 437).

Claimant's additional treatment notes are entirely inapposite to the issue of medical improvement, as they relate to his left knee pain, which was not a basis for the continuation of benefits at the time of his CPD. (Tr. at 231-51). Dr. Cremeans' letter dated June 22, 2012 is similarly immaterial to the ALJ's determination of whether Claimant experienced medical improvement, as it refers only to Claimant's "history of chronic back pain and DJD of his knees," rather than his seizures. (Tr. at 230). In his July 20, 2012 letter, Dr. McComas acknowledges Claimant's history and treatment for seizures and pseudotumor cerebri, but concedes that Claimant "no longer has seizures or evidence of pseudotumor cerebri," although "he does have ongoing headaches and episodes of left-sided numbness." (Tr. at 229). Rather than contradicting the ALJ's findings, this letter appears to be largely consistent with the evidence on record substantiating medical improvement of Claimant's seizure disorder. Dr. McComas does opine that Claimant remains "permanently and totally disabled from any occupation," but it is not clear whether Dr. McComas considers Claimant to be disabled due to his ongoing headaches and left-sided numbness alone, or in combination with his chronic back pain, which Dr. McComas also notes. (Tr. at 229).

Moreover, Dr. McComas did not provide any explanation, analysis, medical findings, or other evidence in support of his opinion. (Tr. at 229). Therefore, Dr. McComas' 2012 letter does not negate the substantial evidence of record reflecting that Claimant experienced medical improvement with respect to his seizures.

Second, none of the additional evidence undermines the ALJ's assessment of Claimant's ability to engage in substantial gainful activity as of August 1, 2010. Dr. Cremeans cautions that Claimant's prescribed medications in June 2012, when taken "alone are extremely sedating and, when in combination, can cause a patient to be poorly functional." (Tr. at 230). However, this letter is unaccompanied by any supporting treatment notes or observations, and offers no insight as to the severity of Claimant's impairments or any functional limitations actually experienced by Claimant on August 1, 2010. (Tr. at 230). Dr. McComas' opinion that Claimant "remains permanently and totally disabled" is an opinion on an issue reserved to the Commissioner, and consequently, is not entitled to any special significance. 20 C.F.R. § 404.1527(d). As discussed above, Dr. McComas' opinion is wholly unsupported by any treatment notes, specific observations, or other rationale. (Tr. at 230). Furthermore, the opinion is inconsistent with the 2010 consultative evaluations of Dr. Beard and Dr. Franyutti, (Tr. at 347-61), as well as Claimant's own report of activities of daily living, which include light housekeeping such as "running the sweeper, doing some laundry, and doing the dishes," as well as "perform[ing] grooming and hygiene tasks independently ... handl[ing] his own finances," (Tr. at 344), and doing "[a] lot of grocery shopping." (Tr. at 37).

Claimant's treatment records relating to his left knee do not contradict the ALJ's RFC assessment because they simply do not pertain to the relevant time frame. At the

time of both the ALJ's decision and the Appeals Council's denial of review, it was the SSA's policy to "consider[] what the claimant's condition was at the time of the cessation determination, not the claimant's condition at the time of the disability hearing/reconsideration determination, ALJ decision or Appeals Council." Acquiescence Ruling 92-2(6), 1992 WL 425419, at *2 (1992) (rescinded by 78 Fed. Reg. 12,129 (Feb. 21, 2013)). The SSA's policy was also the prevailing policy within the Fourth Circuit. *See Goodwater v. Barnhart*, 579 F.Supp.2d 746, 753 (D.S.C. 2007), *aff'd* 263 F. App'x 338 (4th Cir. 2008) (holding that relevant time period ends on the disability cessation date); *Smith v. Astrue*, No. 7:09-CV-41-D, 2010 WL 2691583, at *10 (E.D.N.C. Jul. 6, 2010) (rejecting new evidence that relates to the claimant's conditions and treatment three to four years after the disability cessation date); *Gann v. Astrue*, No. 1:09-cv-355, 2010 WL 3811942, at *14 (W.D.N.C. Sept. 1, 2010) (rejecting evidence relating to the claimant's conditions nearly one year after the cessation date); *but see Money v. Astrue*, No. 1:08-cv-895, 2011 WL 3841972, at *4 n.2 (M.D.N.C. Aug. 26, 2011) (accepting new evidence that post-dates the disability cessation date, but relates to the period on or before the ALJ's decision).[4] On February 21, 2013, the SSA rescinded Acquiescence Ruling 92-2(6) and replaced it with Social

---

[4] At the time of the Commissioner's final decision regarding Claimant's case, there was a circuit split as to the appropriate time frame for determining whether "the individual is *now* able to engage in substantial gainful activity." 42 U.S.C. § 423 (emphasis added). In *Difford v. Secretary*, the SSA argued that "the term 'current,' as used in the statutory and regulatory language, relates merely to the time of the cessation decision under review and thus relates to whether an individual was 'currently disabled' at the time that his or her claim was being reviewed for purposes of determining the presence or absence of medical improvement." 910 F.2d 1316, 1319 (6th Cir. 1990). However, the Sixth Circuit held that "the plain meaning of statutory references to 'now' or 'current' compels a consideration of an individual's ability to perform substantial gainful activity at the time of the hearing." *Id.* at 1320. In response, the SSA issued AR 92-2(6), under which it would apply *Difford* within the Sixth Circuit, but adhere to its policy interpretation in all other jurisdictions. AR 92-26, 1992 WL 425419, at *2-3. Subsequently, the Third and Seventh Circuits deferred to the SSA's policy interpretation after finding the language of 42 U.S.C. § 423 to be ambiguous. See *Hagans v. Comm'r*, 694 F.3d 287, 306 (3d Cir. 2012) (applying *Skidmore* deference); *Johnson v. Apfel*, 191 F.3d 770, 775-76 (7th Cir. 1999) (applying *Chevron* deference). As stated, the SSA's interpretation AR 92-2(6) has been the prevailing policy within the Fourth Circuit, although the Court of Appeals has never explicitly ruled on the issue. *See Goodwater*, 579 F.Supp.2d at 753.

Security Ruling 13-3P, under which the adjudicator must now "consider a beneficiary's disability through the date on which [the adjudicator] makes the appeal determination or decision." SSR 13-3P, 2013 WL 785484, at *4 (2013). However, the SSA did not indicate that SSR 13-3P should be applied retroactively, and no court in the Fourth Circuit has addressed the effect of SSR 13-3P on disability cessation appeals. Notably, Claimant filed his motion for judgment on the pleadings three months after SSR 13-3P was issued, yet he did not take the position that the Ruling applied in this case. The Commissioner was equally silent on the issue, suggesting only that Claimant file a new application for benefits if he believed his condition had worsened after the ALJ's decision. (ECF No. 17 at 28). Thus, in the absence of the SSA's clear intent to apply SSR 13-3P retroactively, and lacking a sound legal basis to deviate from existing circuit policy, the undersigned finds no reason to remand this action for consideration under the expanded time frame adopted in SSR 13-3P.

On August 4, 2010, Claimant's disability was initially determined to have ceased as of August 1, 2010. (Tr. at 49). Claimant's additional treatment notes are dated between April 5, 2012 and July 17, 2012, nearly two years after the date of his cessation of disability. (Tr. at 231-51). Claimant's treatment notes relate to left knee pain and injury he was experiencing contemporaneously with the dates of examination, and therefore cannot reasonably be considered to include any "retrospective opinion on the past extent of an impairment" that was present at the time his disability ceased. *Wilkins v. Secretary*, 953 F.2d 93, 96 (citing *Wooldridge v. Bowen,* 816 F.2d 157, 160 (4th Cir. 1987)). Although Claimant did complain of some left knee pain on June 22, 2010 and August 13, 2010, this pain apparently subsided as Claimant reported no subsequent complaints of left knee pain throughout the duration of the administrative

record. (Tr. at 71-72, 514, 520-22). Thus, rather than representing an ongoing impairment dating back to August of 2010, the additional records appear to reflect that his left knee deteriorated subsequent to the date his disability ended. Indeed, in Dr. Jasko's treatment notes dated May 4, 2012, Claimant reported that his knee discomfort had only been present for the past 9-10 months. (Tr. at 237). Consequently, the 2012 treatment records relating to Claimant's left knee do not in any way invalidate the ALJ's determination of Claimant's RFC as of August 1, 2010.

For these reasons, the undersigned **FINDS** that the ALJ's decision is supported by substantial evidence on the administrative record, despite the additional 2012 treatment notes and treating source letters. Accordingly, remand is not appropriate under sentence four of 42 U.S.C. § 405(g).

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  December 16, 2013.

Cheryl A. Eifert
United States Magistrate Judge

- 34 -